FILED

2012 May-31  AM 11:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHARP REALTY AND MANAGEMENT, LLC, | } | |
| | } | |
| Plaintiff and counter defendant, | } | CIVIL ACTION NO. |
| | } | |
| | } | CV-10-AR-3180-S |
| SHADES PARKWAY, LLC, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | |
| | } | |
| CAPITOL SPECIALTY INSURANCE CORP; SPECIALITY GLOBAL INSURANCE SERVICES, LLC, | } | |
| | } | |
| Defendants, | } | |
| | } | |
| ALLIED WORLD ASSURANCE COMPANY, INC., | } | |
| | } | |
| Defendant and counter claimant. | } | |

### MEMORANDUM OPINION

Undaunted readers of the following lengthy, convoluted and multi-faceted opinion must prepare themselves to have unimpaired vision, deep concentration, and extreme patience, attributes this court tried to bring to its writing task. This case is really two cases, perhaps multifarious for that reason. Keeping the cast of characters straight in two cases has been a virtual impossibility. This has made the court's undertaking even more challenging than it was when the case started out as one case.

The action was removed from the Circuit Court of Jefferson

County, Alabama, to this court on November 19, 2010.  The purpose of the suit initially was to find out if plaintiff, Sharp Realty & Management, LLC ("SRM"), is entitled, in an underlying state case, *Shades Parkway, LLC v. Sharp Realty & Management, LLC, et al.*, CV-2009-902158, pending in the Circuit Court of Jefferson County, Alabama, to a defense and indemnity from defendant, Capitol Speciality Insurance Corp ("Capitol").  Months after the said removal by Capitol, SRM amended its complaint in this court to add another defendant, Allied World Assurance Company, Inc. ("Allied"), which, like Capitol, had written an errors and omissions ("E&O") insurance policy covering a different period under different circumstances.  The court, perhaps mistakenly, allowed the said amendment, and the creation of the cases.

SRM seeks the following six forms of relief both from the original defendant, Capitol, and from the added defendant, Allied (which, with its answer, filed a counterclaim for exoneration): 1) specific performance; 2) damages for breach of contract; 3) damages for bad faith (negligent failure to investigate); 4) damages for bad faith (intentional refusal to afford coverage); 5) damages for fraud for failure to provide promised insurance coverage; and 6) costs of defense in the underlying action.

The court has before it two motions for summary judgment, the first by Allied, doc. 76, and the second by Capitol, doc. 83.  Motions filed contemporaneously are also pending.  Allied filed a

motion to exclude the testimony of SRM's expert, Clarence Small ("Small").  Doc. 87.  Capitol filed a motion to strike portions of an affidavit attached to SRM's brief.  Doc. 96.

For the reasons that follow, Allied's motion to exclude the testimony of SRM's expert will be granted in part, and Allied's motion for summary judgment will be granted.  Capitol's motion to strike portions of SRM's affidavit will be granted, and Capitol's motion for summary judgment will be granted.

## BACKGROUND FACTS[1]

### Allied, Capitol, and Speciality Global Insurance Services

Allied and Capitol are surplus lines insurance companies that, among other things, provide E&O insurance coverage in Alabama.[2] Speciality Global Insurance Services ("Speciality Global") is nothing but a trade name for the division of Capitol that handles E&O matters, including underwriting and processing of claims. Speciality Global is not a legal entity separate from Capitol.[3]

---

[1] Because of the procedural posture, all arguably admissible evidence will be viewed in the light most favorable to SRM.

[2] E&O insurance coverage generally refers to coverage for negligent acts, errors or omissions that an insured commits, or is alleged to have committed, in the performance of its covered activities.

[3] In an order entered May 24, 2011, doc. 45, this court deemed Speciality Global a "non-entity . . . represented to be an operating division of Capitol Insurance Companies," and stated that "[t]he exact relationships between the named parties and Capitol Insurance Companies is as yet undetermined."  Although SRM designated Speciality Global as an LLC in its complaint, Capitol has provided evidence that there is no entity called Speciality Global Insurance Services, LLC.  Rather, Speciality Global is a division of Capitol, and a jurisdictional non-entity.  As such, the court's decision concerning the claims SRM asserts against Capitol applies with equal force to the claims asserted against Speciality Global.  *See* 1 W. Fletcher,

Being a part of Capitol, it will hereinafter be referred to as "Capitol," except where there is a reason to distinguish the two. Prior to 2009, Speciality Global was a division of Allied that handled E&O insurance.   In 2009, Allied sold its book of E&O insurance business to Capitol, in a transaction that also included Speciality Global's becoming a division of Capitol.   The Speciality Global staff went to Capitol.   The degree of intimacy, if any, between Allied and Capitol after the said transaction is left to speculation, but it has caused confusion.

### Sam Sharp, SRM, and Shades Parkway, LLC

Sam Sharp ("S. Sharp") is in the real estate business in Birmingham, Alabama.   Part of his business is the leasing and management of commercial real estate.   S. Sharp is the 100% owner of SRM, which he formed in 1991.   SRM is a real estate management company that has regularly managed commercial properties in which S. Sharp, himself, had an interest.   While SRM occasionally managed properties that S. Sharp owned no part of, S. Sharp's business model has typically been to create, with others, an ownership entity, usually an LLC, which buys or builds a commercial property, after which the owner entity contracts with SRM to manage the property.

---

ENCYCLOPEDIA OF PRIVATE CORPORATIONS § 43 at 732 (perm. Ed. Rev. 1990) (noting that the term "division of" has no legal significance and therefore, when an entity is itself unincorporated, and identifies itself as a division of a corporation, acts of the "division" may be attributed to the corporation).

In accordance with S. Sharp's business model, Shades Parkway, LLC ("Shades Parkway"), in or about 2000, developed and became owner of real property known as Shades Creek Plaza. Shades Parkway had three members or owners: 1) BHL Commercial Ventures, LLC ("BLH"), which owned 37.5%; 2) Shades Creek, LLC ("Shades Creek"), which owned 37.5%; and 3) Sharp Realty-Shades Creek, LLC ("SR-SC"), which owned 25%. The sole member or owner of SR-SC was and is S. Sharp. SR-SC's only function was to act as a means for S. Sharp to "own" 25% of Shades Parkway. For the purposes of this case, SR-SC can be treated as "Sam Sharp d/b/a SR-SC." Shades Parkway also had three managers, one designated by each of its three members. Jim Rein ("Rein") was designated by BHL as its manager; Benny LaRussa ("LaRussa") was designated by Shades Creek as its manager; and S. Sharp was designated by SR-SC as its manager. Under Shades Parkway's operating agreement, SRM actually managed Shades Creek Plaza for a stated compensation, during the years 2000 to 2009.

**E&O Policies Purchased By SRM From Allied**

S. Sharp used the services of Bubba Bates ("Bates") of Bates Insurance Agency of Birmingham, Alabama for the procurement of E&O insurance coverages for SRM's business needs. From November 2004 to November 2007, Bates purchased E&O insurance for SRM from Tudor Insurance Company ("Tudor"). In November 2007, Tudor informed Bates, through Gresham & Associates ("Gresham"), an insurance broker through which Bates had procured the earlier Tudor E&O

policies for SRM, that any renewal of SRM's E&O policy would exclude coverage for claims arising from management or leasing of properties in which an insured owns or has an equity interest. As a result of this change in Tudor's proposed E&O coverage, Bates sought alternative E&O insurance coverage for SRM. In November 2007, Bates procured a miscellaneous E&O insurance policy for SRM from Allied. Whether or not Bates discussed with Allied the reasons for leaving Tudor and going to Allied is not shown. Speciality Global, at that time still a division of Allied, caused the issuance of the Allied E&O policy to SRM. The Allied policy had effective dates of November 22, 2007 to November 22, 2008. The policy was renewed by Allied for a second year, with a policy period from November 22, 2008 to November 22, 2009. Under both Allied policies, SRM was the first-named insured, and S. Sharp was the second-named insured. SRM's present claim against Allied is made under the second policy, numbered SG00813-002.

**E&O Policy Purchased By SRM From Capitol**

In August of 2009, Speciality Global, before becoming part of Capitol as a result of Capitol's purchasing Allied's book of E&O business, began the process of deciding whether to extend E&O coverage to SRM for another year. Its underwriter forwarded to Gresham, which in turn forwarded to Bates, an Existing Account Application, a Real Estate Supplement, and a Supplemental Claim Form. These were applications to Capitol and not to Allied. Bates

forwarded documents to S. Sharp.  On November 10, 2009, S. Sharp executed the Existing Account Application and Real Estate Supplement, but not the Supplemental Claim Form.  The two signed documents were sent to Speciality Global for processing on behalf of Capitol.  Question 6.1 of the Existing Account Application asked: "Is applicant aware of any actual or alleged fact, circumstance, situation, error or omission, which can reasonably be expected to result in a claim, suit or proceeding during the past year?", to which S. Sharp answered "NO."  The underlying case against SRM was pending at that time.

Effective November 22, 2009, Capitol issued a miscellaneous E&O policy to SRM, with a policy period of one year ending on November 22, 2010.  SRM was the first-named insured, and S. Sharp was the second-named insured.  SRM's claims against Capitol in this court are made under the policy numbered SG0014001.

**The State Court Lawsuits**

A dispute arose in April 2009 among the three members of Shades Parkway and their designated managers.  Managers LaRussa and Rein, representing members Shades Creek and BLH, respectively, and together holding 75% of the voting interests, voted to terminate SRM's contract to provide management services to Shades Parkway, over the objections of S. Sharp, SR-SC, and SRM.  S. Sharp retained the law firm of Harris & Harris to represent his interests in the said dispute.  On April 16, 2009, with Jim Harris ("Harris") as his

lawyer, SR-SC filed suit in the Circuit Court of Jefferson County, Alabama against Shades Creek, BLH, LaRussa, and Rein. The case is styled *Sharp Realty - Shades Creek, LLC, et al. v. BLH Commercial Ventures, LLC, et al.,* CV-2009-1173 (hereinafter "the SR-SC lawsuit"). The SR-SC lawsuit sought damages on behalf of SR-SC for the named defendants' alleged wrongful termination of SRM's real estate management contract. On July 6, 2009, the three defendants filed an answer and counterclaim, and simultaneously filed a third party complaint against S. Sharp and SRM. The counterclaim and third party complaint contained three counts: breach of fiduciary duty, conspiracy, and for an equitable accounting. Counterclaimants and third-party plaintiffs made no charge of negligence. Harris, S. Sharp's counsel, received the answer, counterclaim, and third party complaint from S. Sharp on the same day they were filed.

On July 6, 2009, Shades Parkway filed an entirely new and separate lawsuit against SRM, SR-SC, and S. Sharp in the Circuit Court of Jefferson County, Alabama, styled *Shades Parkway, LLC v. Sharp Realty & Management, LLC, et al.,* CV-2009-902158 (hereinafter, "the Shades Parkway or underlying lawsuit"). This new and separate suit alleged that SRM had committed various acts of misconduct with respect to the management of Shades Creek Plaza, including negligent failure to collect rents and common area maintenance charges from tenants, conspiracy, breach of contract,

breach of fiduciary duty, and sought an equitable accounting.  The allegations made by Shades Parkway in its said lawsuit against SRM followed upon the heels of an audit of SRM's performance as manager of Shades Creek Plaza over the years 2006 to 2009.  BLH and Shades Creek retained Wray Pearce ("Pearce"), a forensic accountant, to conduct this audit.  Pearce outlined his findings in a letter to LaRussa and Rein, dated June 4, 2009.  It stated in part:

> In my opinion, from the review of the above referenced documents, [SRM] has not collected rent or common area maintenance charges appropriately for Shades Parkway, LLC . . . . Total rent and CAM adjustment fees owed to Shades Parkway, LLC are $218,893, from 2006 through April 2009.

Pearce reached no conclusion as to whether SRM owed this sum as a proximate consequence of tortious conduct or for breach of contract by SRM, or a combination of both.

On July 10, 2009, a process server served S. Sharp with three summonses and complaints in the Shades Parkway lawsuit, one against him, one against SRM, and one against SR-SC, along with requests for production of documents and notices of taking depositions.  S. Sharp did not read the papers.  He testified that if he had read them, he would have understood that they represented claims being brought against him, SRM, and SR-SC by Shades Parkway.  Instead, he simply delivered the summonses and complaints and accompanying documents to Harris.

During his deposition, S. Sharp denied that any conversation

9

took place between him and Harris about whether the complaints in the Shades Parkway lawsuit, or any notice of them, should be given to any insurer or insurers.  Allied, whose policy was in effect at that time, was not notified.  S. Sharp admits that neither he, nor Harris, nor Bates, provided any notice whatsoever to Allied of the filing of the Shades Parkway lawsuit until eight months later.

The SR-SC lawsuit and the Shades Parkway lawsuit, which, to some extent overlap, were later consolidated before the Circuit Court of Jefferson County, Alabama, and were litigated together from 2009 until the present.  During the course of this state court litigation, SRM produced documents that Shades Parkway requested on July 10, 2009.  At some point after SRM's document production, Pearce examined the said documents and began a second audit of SRM's performance as manager of Shades Creek Plaza.  He authored a second letter to LaRussa and Rein, dated May 5, 2010.  Pearce expanded the scope of his search of SRM's management, identifying alleged failures of SRM to collect rents and other charges during the years 2000 to 2009.  The letter concluded:

> In my opinion, from a review of the above referenced documents, [SRM] has not collected rent or common area maintenance charges in accordance with the terms of the leases. Below is an explanation by tenant of amounts we could determine from the information provided were not appropriately collected.

On June 3, 2010, Shades Parkway's counsel provided SRM's counsel a copy of the May 5, 2010 Pearce letter, by way of Supplemental

Interrogatory Answers, and Shades Parkway shortly thereafter increased its claim against SRM in the underlying suit to $752,846.43. This new amount of alleged loss encompassed both the time covered in the first audit and in the second audit, which overlapped the first.

**SRM Notifies Allied and Capitol of the Shades Parkway Lawsuit**

Sometime in early 2010, S. Sharp's father, attorney Charles Sharp ("C. Sharp"), suggested that SRM's insurance policies be reviewed to see if any of them provided coverage for the claims in the Shades Parkway lawsuit. The policies were reviewed by some person or persons not shown. On March 16, 2010, S. Sharp's and SRM's insurance agent, Bates, gave notice of the Shades Parkway lawsuit to Capitol by sending a notice-of-claim form to Capitol. The notice referenced Capitol as the insurance company, and, referred to Capitol's policy numbered SG0014001. This policy covered the time from November 22, 2009 to November 22, 2010. Capitol forwarded the notice-of-claim form to Allied's claims department, where the claim was assigned to Stephanie Lizotte ("Lizotte"), a senior claims analyst, on or about March 22, 2010. The March 16, 2010 notice-of-claim form, received by Allied on or about March 22, 2010, was the first notice of any kind to Allied or to any of its affiliates of the filing, service, or pendency of the Shades Parkway lawsuit. It is unclear as to whether Bates was intending to call upon Capitol or upon Allied for coverage.

11

**Allied Defends Under a Reservation of Rights**

On April 20, 2010, Lizotte wrote S. Sharp a letter on behalf of Allied, declining coverage, based on two policy exclusions and on untimely notice.  Lizotte stated that: 1) S. Sharp, through SR-SC, owned 25% of Shades Parkway, and liability for claims made by an entity over which the insured has an ownership interest and exerts influence or control is excluded under the policy pursuant to Exclusion II B; 2) Shades Parkway's complaint in the Shades Parkway lawsuit alleged SRM's breach of a 2006 Property Management Agreement, so that any liability arising from breach of contract is not covered under Part II A of the policy, that is, except for liability the insured would have in the absence of such a contract; and 3) SRM failed to provide the required prompt notice of the claim when it did not give notice of the lawsuit until eight months after being served.  Allied did not mention Capitol in its denial letter, and Capitol itself did not reply.

On June 21, 2010, C. Sharp, on behalf of S. Sharp and SRM, wrote Lizotte a letter asking Allied to reconsider its position. On July 22, 2010, Stacy McGraw ("McGraw"), a coverage attorney for Allied, wrote C. Sharp a letter in which she advised that, in light of the matters addressed in the June 21, 2010 letter, Allied would, for the moment, treat the Shades Parkway lawsuit as a claim for the purpose of providing a defense in the underlying lawsuit, **but under a full reservation of rights**.  The letter further requested C.

12

Sharp to provide an explanation, if he could, for the eight-month delay in SRM's providing notice to Allied of the service of the Shades Parkway lawsuit on SRM.

On August 3, 2010, C. Sharp spoke with McGraw by telephone. According to C. Sharp, during the said conversation, C. Sharp negotiated for, and Allied agreed to pay, one-half of Harris's fees and expenses in defending SRM in the Shades Parkway lawsuit. This was in lieu of Allied's picking its own attorney to defend SRM.

On October 29, 2010, C. Sharp sent McGraw invoices from Harris and from Forensic Strategic Solutions, SRM's expert in the Shades Parkway lawsuit, and requested payment for services rendered to SRM from August 9, 2010 through September 17, 2010. C. Sharp requested payment of one-half of the total amount of these invoices, which totaled $11,751.35.

According to C. Sharp, from August to December 2010, no one at Allied responded to his repeated requests that Allied pay the said $11,751.35. On December 1, 2010, McGraw sent C. Sharp an e-mail stating that Allied was reviewing his October 29, 2010, request, but denied that she and C. Sharp had agreed over the phone that Allied would reimburse one-half of SRM's defense costs.

On January 21, 2011, McGraw informed Bates that Allied would, in fact, reimburse SRM for one-half of Harris's August and September invoices. On January 25, 2011, C. Sharp sent Allied additional invoices for services rendered by Harris during the

13

months of October, November, and December, 2010.  On February 14, 2011, McGraw advised C. Sharp that payment of one-half of the Harris invoices from August through December 2010, which totaled $26,227.46, was being mailed.  Allied issued its check in this amount three days later.  SRM received and processed the check on February 22, 2011.

**Capitol's Denial of Coverage**

As noted previously, SRM indiscriminately or ambiguously notified either Allied or Capitol, confusingly intertwined, of the Shades Parkway lawsuit on March 16, 2010.  Subsequently, on June 16, 2010, SRM forwarded to Speciality Global (by then a division of Capitol that processed E&O claims both for Capitol and Allied) the second Pearce audit letter, which had been produced by Shades Parkway to SRM in the Shades Parkway lawsuit, and which was contemporaneously used by Shades Parkway to increase the amount of the damages it claimed for lost rent, etc. in that action.

On June 18, 2010, Gretchen Sayers ("Sayers"), a claims handler for Capitol, wrote a letter to S. Sharp, confirming receipt of a copy of the Shades Parkway lawsuit that had been filed on July 6, 2009, but declining coverage based on two provisions of the Capitol E&O policy effective November 2009 to November 2010: 1) the policy terms preclude coverage because the Shades Parkway lawsuit did not satisfy the policy requirements of Part V.B.1 and Part V.B.5 that only claims first made against the insured during the policy period

14

were covered, and that the information sent to Capitol that the "scope of the suit has been increased" could not retroactively invoke coverage, because all claims arising from the same erroneous or wrongful conduct are contractually considered to have been made on the earlier of the date upon which the first of the claims is made against the insured or the date the insurer first received the insured's written notice of the erroneous act; and 2) S. Sharp, through SR-SC, owned 25% of Shades Parkway, so that liability for claims made by an entity over which the insured has an ownership interest and exerts influence or control is excluded pursuant to Exclusion II B. The letter included general reservation of rights language. It concluded:

> Our determination is based on information provided to date. If you believe we are mistaken, or if you have additional information that you believe we should consider, please advise.

On June 22, 2010, C. Sharp responded to Sayers, again taking issue with her coverage conclusions. Specifically, in response to Sayers's conclusion that the claim against Capitol was not first made during the policy period, C. Sharp asserted that the Supplemental Interrogatory Answers served on SRM in the Shades Parkway lawsuit on June 3, 2010, created a claim that was covered by Capitol's November 2009-November 2010 policy because it indicated for the first time that Shades Parkway was claiming damages of $752,846.43 and was alleging new and earlier covered

15

acts.  What C. Sharp's position would have been if Shades Parkway had merely amended its complaint in the underlying action to increase the *ad damnum*, is not reflected.  Shades Parkway has never amended its complaint in the underlying lawsuit to remove claims arising from alleged breach-of-contract.

Sayers responded on July 15, 2010, reiterating her position and again declining coverage.  She stated that the Shades Parkway lawsuit, filed and served in July 2009, is the only negligence claim, and it was thus made prior to the beginning of Capitol's 2009-2010 coverage period.  She strongly disagreed with C. Sharp's position that Shades Parkway's increase of the amount of damages as a result of events occurring during the policy period constituted a new, separate and additional claim.  She further pointed out that the Existing Account Application submitted on November 10, 2009 by S. Sharp did not disclose the existence of the Shades Parkway lawsuit.  She also stated that Capitol reserved all rights to assert the failure timely to disclose the Shades Parkway lawsuit as an act that may constitute a misrepresentation or omission of material information required by the underwriters.  Lastly, the letter again requested that SRM provide any further information it would like Capitol to consider.  Whether or not the failure to reveal the lawsuit before Capitol issued its policy was a "material" misrepresentation that would have caused a different underwriting decision might be a question for a jury were Capitol

16

not entitled to summary judgment for other reasons, and if SRM had offered any substantial evidence that the answer "No" was immaterial.

On July 23, 2010, C. Sharp again wrote to Sayers, this time making reference to possible claims against Capitol for bad faith refusal to provide coverage and negligent failure to investigate. On October 27, 2010, David Allred ("Allred"), an outside attorney for Capitol, wrote C. Sharp again explaining Capitol's position, and reiterating Capitol's earlier responses that coverage was not available for three reasons: 1) the claim was not first made during the policy period; 2) there was a material misrepresentation in the application; and 3) the policy excludes claims made by affiliated entities over which the insured exerts influence and control. This letter again asked SRM to provide any additional facts and legal arguments that Capitol might consider in another re-evaluation of the claim. Capitol could not, at that time, interpose as a defense SRM's recent settlement with Shades Parkway. It will be discussed below.

**The Recent Settlement of the Underlying State Court Lawsuit**

The Shades Parkway lawsuit, which had been consolidated with the SR-SC lawsuit, proceeded in state court through 2010 and 2011, with Harris representing SRM and S. Sharp until October 2010. John Fraley ("Fraley"), another Birmingham lawyer, entered a notice of appearance for SRM and S. Sharp in the underlying lawsuit on

October 29, 2010, and he has been officially representing SRM and S. Sharp since that time.  Fraley was initially retained by General Casualty ("GC"), SRM's comprehensive general liability ("CGL") carrier.  What interest, if any, GC has in the instant case or the state court cases is not revealed.  Allied's entering into an agreement with GC to share the costs of Fraley's representation suggests some interest.  All of Fraley's fees have been paid by GC and/or Allied.  Neither S. Sharp nor SRM has been called upon to pay any of Fraley's fees.

On September 30, 2011, S. Sharp, SRM, and SR-SC entered into a written settlement agreement with Shades Parkway and the other parties to the Shades Parkway lawsuit.  Fraley was neither called upon, nor involved in, the negotiation or review of this agreement before it was signed.  When Fraley became aware of the settlement is not reflected in the record.

The settlement agreement of the Shades Parkway lawsuit, in final form, provided in pertinent part:

1) All claims against any party to the lawsuit are dismissed "except that Shades Parkway does not hereby release its claims against SR&M [SRM] in the Shades Parkway lawsuit."  The settling parties agree "to file a joint stipulation of dismissal with prejudice of Shades Parkway's claims against SR&M [SRM] in the Shades Parkway Lawsuit within 30 days of either a determination that there is no insurance coverage of SR&M [SRM] with respect to

18

those claims, or, in the event that there is insurance coverage of SR&M [SRM] with respect to those claims, resolution of those claims by settlement or otherwise."

2) SR-SC transfers and sells its entire interest in Shades Parkway to BHL and Shades Creek;

3) SR-SC releases any and other all rights that it has in Shades Parkway;

4) SR-SC retains a 25% interest "in any proceeds of the insurance policies at issue in the SR&M [SRM] Coverage Litigation that are paid to Shades Parkway to settle Shades Parkway's claims against SR&M [SRM] in the Shades Parkway Lawsuit."

## PROCEDURAL HISTORY

At this point, some repetition is necessary for full understanding. On November 3, 2010, while being denied coverage by Capitol, SRM sued Capitol and Speciality Global in the Circuit Court of Jefferson County, Alabama, asserting claims for specific performance, breach of contract, bad faith (negligence and failure to investigate), bad faith (intentionally refusing to afford coverage), and fraud. SRM did not sue Allied at that time. Capitol removed the case to this court on November 19, 2010. On March 16, 2011, this court found that Shades Parkway is a necessary party pursuant to Rule 19(a)(1)(B), Fed.R.Civ.P., and aligned it with SRM as a plaintiff, while advising Shades Parkway that it need not actively participate unless and until it decided to do so. It

has never decided to do so.  However, its alignment with SRM goes unchallenged and it is bound by this decision to the extent Shades Parkway may be affected by it.

On April 7, 2011, SRM amended its complaint in this court to add Allied as a defendant, asserting claims against Allied similar to, if not identical to, those previously made against Capitol, namely, specific performance, breach of contract, fraud, and bad faith (negligent failure to investigate).  On May 23, 2011, Allied answered SRM's amended complaint and filed a counterclaim, seeking a declaratory judgment that it owes no obligation to defend or indemnify SRM against the claims made against SRM in the Shades Parkway lawsuit.  Capitol, the original defendant, did not counterclaim to seek a declaration that it owes no coverage.  For the court to provide such declaration would be surplusage.  **If there is no "coverage", there is no coverage.**

On December 3, 2011, Allied filed its motion for summary judgment, doc. 76, to which SRM responded, doc. 85, and Allied replied, doc. 90.  Subsequently, Allied filed a motion to exclude the testimony of SRM's expert, Small, doc. 87, to which SRM responded, doc. 97.  Additionally, Allied filed an objection to allegedly unsupported and inadmissible statements of purported fact in SRM's response brief.  Doc. 89.

On January 6, 2012, Capitol filed its motion for summary judgment, doc. 83, to which SRM responded, doc. 91, and Capitol

replied, doc. 94.   Capitol has also filed a motion to strike portions of the affidavit of S. Sharp, doc. 96, to which SRM has responded, doc. 98.   There are numerous attachments to all of these filings.

## DISCUSSION

### I.   Allied's Motion to Exclude Testimony of SRM's Expert

Before directly addressing Allied's motion for summary judgment, the court will address Allied's motion to exclude the testimony of Small, SRM's expert.   Small is a senior partner in Christian & Small, LLP, a well-known and respected law firm, of which Bibb Allen, Alabama's dean of insurance law, was a member before his death.   SRM designated Small as an expert who would provide opinions in accordance with Rule 26, Fed.R.Civ.P.   Small wrote a Rule 26(a)(2)(B) report stating his understanding of the terms of the insurance policies at issue and how their terms should be interpreted under relevant Alabama law.   He did not purport to testify about what was "material" and what was "immaterial" in the underwriting process, and what the insurers had a legal right to expect from the insureds.   Small's report was served on Allied on October 12, 2011.   Small testified by deposition on November 15, 2011.

SRM uses portions of Small's report in response to Allied's motion for summary judgment.   In particular, SRM quotes portions of Small's report in which he expresses the ultimate opinion that SRM

is covered by the Allied policy.  He discusses the meaning and effect of various terms in the policies and supports his opinions by saying how those terms should properly be interpreted under Alabama law.  In essence, in lieu of offering separate legal arguments or rules of construction as to why Allied owes SRM coverage under the insurance policies, SRM quotes Small's expert report, in which Small repeats or elaborates the same legal arguments that C. Sharp makes on SRM's behalf.  Unlike a physician, an independent expert in a medical malpractice case, Small assumes the role of arbiter and fact-finder on a subject involving language and not a technical or scientific subject.  This creates a classic case for a court to fulfill in its gatekeeping obligation.  Juries are presumed to be competent, to understand language, even esoteric language.  The Seventh Amendment presumes it, assuming the jury is properly instructed.  Although this court rejects much of Small's testimony as matters for the court or jury, the court will credit S. Sharp and SRM with having adopted Small's conclusions and arguments as their own.

Under Federal Rules of Evidence 401 and 702, Allied has moved to exclude Small's testimony, on two grounds: 1) the **meaning** of the terms of an insurance policy, and the law that applies to it, are not topics appropriate for expert opinion; and 2) even if these matters are appropriate for expert commentary, Small is not qualified as an "expert" when the standards of *Daubert v. Merrell*

22

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co.,*
*Ltd. v. Carmichael*, 526 U.S. 137 (1999), are applied.

Rule 702, Fed.R.Evid, provides:

> A witness who is qualified as an expert by
> knowledge, skill, experience, training, or
> education may testify in the form of an
> opinion or otherwise if:

> (a) the expert's scientific, technical or
> other specialized knowledge will help the
> trier of fact to understand the evidence or to
> determine a fact in issue;

> (b) the testimony is based on sufficient facts
> or data;

> © the testimony is the product of reliable
> principles and methods; and

> (d) the expert has reliably applied the
> principles and methods to the facts of the
> case.

Rule 702 was amended in 2000 in a Congressional response to *Daubert*
and its progeny.  The committee comments on the 2000 amendment
state:

> In *Daubert* the Court charged trial judges with
> the responsibility of acting as gatekeepers to
> exclude unreliable expert testimony, and the
> Court in *Kumho* clarified that this gatekeeper
> function applies to all expert testimony, not
> just testimony based in science.

The burden of establishing the qualification, reliability and
helpfulness of an expert rests on the party offering the expert
opinion.  Because Allied has challenged SRM's expert, SRM bears
this burden.  *See United States v. Frazier*, 387 F.3d 1244, 1260
(11th Cir. 2004).  In determining the admissibility of expert

23

testimony under Rule 702, the court must decide whether "(1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of **scientific, technical, or specialized** expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, 489 F.3d 1117, 1124-25 (11th Cir. 2007) (emphasis added). This determination is, of course, a fact-specific inquiry, although the exercise of a court's discretion is called for. *United States v. Brown*, 415 F.3d 1257, 1267-68 (11th Cir. 2005).

It is universally understood that interpreting a contract is, in 99% of the cases, a matter for the fact-finder. If the contract is unambiguous, it is a matter for the court. If ambiguous, the rules of contract construction, including *contra proferentem*, apply, whereupon the meaning becomes fair game for the trier of fact who is allowed to hear evidence of intent from outside the four corners of the writing. *See, e.g., Brown Mech. Contractors, Inc. v. Centennial Ins. Co.*, 431 So. 2d 932, 942 (Ala. 1983).

In *Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir. 1986), a party sought to call as an expert a lawyer in the case. The "expert" wanted to testify as to what the securities laws that were applicable to the case meant, as well as what the applicable

24

securities laws did or did not require of the parties.  In holding that the district court did not err in excluding the lawyer's proposed testimony, the Fourth Circuit held:

> If such experts are to testify to the meaning and applicability of securities laws, what line is to be drawn to exclude tort lawyers from offering their expert opinions to the jury as to the meaning and applicability of the laws governing tort litigation?  Examples of this sort could be multiplied across the gamut of litigation.

*Id.* at 366.  In *Marx & Co., Inc. v. Diner's Club, Inc.,* 550 F.2d 505 (2nd Cir. 1977), the Second Circuit held that the district court erred in permitting a lawyer, designated as an expert witness, to give his opinion as to the legal obligations of the parties under a contract, reasoning:

> The basis of expert capacity, according to Wigmore [on Evidence] (§ 555) may "be summed up in the term 'experience.'"  But experience is hardly a qualification for construing a document for its legal effect when there is a knowledgeable gentleman in a robe whose exclusive province is to instruct the jury on the law.

*Id.* at 512.

There is another reason for not allowing Small's testimony. Small testified that he has never before served as an expert witness regarding any coverage issues in insurance litigation.  He disavowed having a "comprehensive knowledge" of insurance law in Alabama, stating instead that he has a "working knowledge."  He has never worked for an insurance company, except as outside counsel.

He has no "special knowledge or experience in dealing with what's called a miscellaneous errors and omissions policy."  And, he cannot recall any case in which he was involved that dealt with an E&O policy.  *See* Small depo. at 4-23.  To present Small as an expert, SRM provides a list of Small's many trials, involving various legal issues, as well as a list of the clients of Christian & Small, the insurance defense firm in which Small is a senior partner.  Alternatively, SRM asks the court to allow Small's opinion only for summary judgment purposes, while promising that Small will not be called upon to testify at trial, except to explain the policy provisions in simple and logical terms.  To make a distinction between "simple" and "complex" is beyond this court's competency.  Small is recognized by his peers and by this court as an experienced and highly skilled insurance lawyer, but the court finds that, under *Daubert* scrutiny, he is not qualified to testify as an expert on the **meaning** and **effect** of these more or less standard insurance policies.  SRM argues vociferously that Small has "the unique talent of **explaining** insurance policies and **condensing** the **holdings** of complicated insurance coverage cases into one or two simple, easily understood sentences," doc. 97, at 3, but Small's considerable ability to explain things does not make him any more qualified to explain things than a United States District Judge, or, for that matter, the lawyers who now are very well representing their clients.

To repeat, a court should seldom, if ever, allow an "expert" to opine on the meaning of a statute, regulation, or a contract. The parties have employed competent counsel to do the needed legal research and to reach their respective litigation positions and to advocate their clients' conflicting views.  The court will consider Small's testimony only as an addendum to, or a repetition of, the opinions of C. Sharp and his clients.  Allied's motion to exclude Small's expert testimony will therefore be granted to the extent Small purports to explain or express an opinion on meaning, intent, or understanding of the words in these insurance policies, or of the law of Alabama that is applicable to the insurance matters.

It would create a procedural nightmare if SRM's claims against Allied and Capitol were to be tried together.  If, the court could not allow Small to testify against Capitol because Capitol did not file a motion to strike Small's testimony, the jury would still hear it.  This proves the  multifarious nature of the case.

## II.  Allied's Objection to Certain Alleged Statements of Fact in SRM's Brief

Before reaching its summary judgment motion, Allied has, in a separate document, objected to what it says are unsupported and inadmissible statements of fact contained in SRM's response brief. Doc. 89.  Allied argues that many of the statements cannot be considered because they fall into several forbidden categories: 1) hearsay; 2) not supported by admissible evidence; 3) not referencing admissible evidence; 4) narrative form; 5) speculative

and conclusory; and/or 6) blurring lines between counsel and witness. Allied attaches as an exhibit its delineation of the statements of purported fact it objects to. Allied's objections will be treated as a motion to strike.

Much of SRM's brief is written as a first-person account by C. Sharp, who is SRM's and S. Sharp's attorney of record in this case. It consists of observations and opinions, without citations to the evidence in this case, or evidence in the underlying case. C. Sharp was deposed as a fact witness. In large part he makes argumentative, conclusory, and unsubstantiated statements of "fact." There is no question that "[u]nadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence." *Taylor v. Holiday Isle, LLC*, 561 F. Supp. 2d 1269, 1275 n.11 (S.D. Ala. 2008).

Perhaps more worrisome is the fact that C. Sharp is filling the dual roles of witness and advocate for his clients. For good reason, this practice is discouraged by the Alabama Rules of Professional Conduct. The posture in this case is very similar to that in *State Farm Fire & Cas. Co. v. Richardson*, 2008 WL 4531765 (S.D. Ala. Oct. 9, 2008), in which Judge Steele wrote:

> It is problematic that Robinson, the same attorney who had numerous contacts with State Farm on Richardson's behalf during State Farm's investigation of this claim, now represents him in this lawsuit relating to that investigation. As this discussion demonstrates, Robinson is a witness to this

28

case, and it seems likely that in any trial of
these proceedings Robinson would be called to
testify as to his dealings with State Farm on
Richardson's behalf concerning the insurance
investigation that lies at the heart of this
lawsuit. As such, the propriety of Robinson's
representation of defendant in these
proceedings is in some doubt. *See, e.g.,
Putman v. Head,* 268 F.3d 1223, 1246 (11th Cir.
2001) ("[R]ules of professional conduct
generally disapprove of lawyers testifying at
proceedings in which they are also
advocates."); Alabama Rules of Professional
Conduct, Rule 3.7(a) ("A lawyer shall not act
as an advocate at a trial in which the lawyer
is likely to be a necessary witness, except
where: (1) the testimony relates to an
uncontested issue; (2) the testimony relates
to the nature and value of legal services
rendered in the case; or (3) disqualification
of the lawyer would work substantial hardship
on the client.").

The "facts" here objected to by Allied, if not stricken, would
not create any undisputed material facts that would save SRM from
summary judgment.

**III. Allied's Motion for Summary Judgment**

While seeking summary judgment, Allied redundantly requests a
declaration that it owes no duty to defend or to  indemnify SRM in
the Shades Parkway lawsuit.  It makes the following arguments: 1)
SRM failed to comply with Allied's policy condition that it provide
prompt notice of any claim for which it seeks coverage; 2) SRM's
claims for specific performance, breach of contract, bad faith, and
fraud must be dismissed because Allied is actually defending SRM in
the Shades Parkway lawsuit under a reservation of rights; and 3)

29

SRM's recent settlement of the Shades Parkway lawsuit voids any coverage that might otherwise have existed, because it violates the cooperation clause and the policy condition that Allied is only required to defend and indemnify the insured **for damages for which the insured "becomes legally obligated to pay."**

Allied's arguments will be addressed in turn.

### SRM's Failure to Comply with the Prompt Notice Provision

A process server personally served S. Sharp, principal of SRM, with the underlying suit on July 10, 2009. The said complaint alleged various acts of wrongful conduct with respect to SRM's management of Shades Creek Plaza. Some are *ex contractu*. Some are *ex delicto*. SRM did not notify Allied of the Shades Parkway lawsuit until March 16, 2010, more than eight months later. Allied's first and best argument is that SRM's failure to provide prompt notice, unequivocally required by the policy, is a material breach that voids coverage.

Allied's policy in effect when S. Sharp was served on July 10, 2009, had effective dates of November 22, 2008 to November 22, 2009, and stated in pertinent part:

> B. **Claim** means a suit, a written demand or a written assertion of a legal right, any of which seeks **Damages** against an **Insured.**

> This Policy applies to **Claims** first made

against an Insured during the **Policy Period.** The **Company** will consider a **Claim** to be first made against an Insured when a written **Claim** if first received by an Insured during the **Policy Period** or any Extended Reporting Period.  All terms and conditions of this Policy in effect on the date the **Claim** is first made will apply to the **Claim.**

\* \* \*

B.   WHAT TO DO IF AN INSURED HAS A CLAIM

If there is a **Claim**, or a circumstance or incident likely to result in a **Claim**, the **Insured** must promptly do the following:

1.   Notify the **Company** in writing; this notice must:

   a.   Be sent to:

      Speciality Global Insurance Services
      Attn: Claims Manager
      8500 Shawnee Mission Parkway, Suite L2
      Shawnee Mission, Kansas 66202

      and

   b.   Identify the **Insured** and Claimant, and provide reasonably obtainable information concerning the time, place and other details of the **Erroneous Act** and **Claim** or potential **Claim;**

2.   Send the **Company** copies of all demands, notices, settlement offers, summonses or

31

> legal papers received in connection with
> the Claim or potential **Claim**;
>
> 3.  Upon the **Company's** request, authorize the
>     **Company** to obtain records and other
>     information;
>
> 4.  Cooperate with and assist the **Company** in
>     the investigation, settlement and defense
>     of the **Claim**; and
>
> 5.  Cooperate with and assist the **Company**,
>     upon the **Company's** request, in enforcing
>     any rights of contribution or indemnity
>     against another party who may be liable
>     to an **Insured**.

(emphasis in original).

Alabama law[4] is clear that notice provisions must be adhered to by the insured, and that compliance with them is a condition precedent to coverage.  Prejudice to the insurer by late notice is presumed.  In *Lemuel v. Admiral Ins. Co.*, 414 F. Supp. 2d 1037, 1055 (M.D. Ala. 2006), employing Alabama law, the court held:

> When an insurance Policy contains a condition
> precedent to coverage that the insured provide
> prompt notice of a claim or suit, the insured
> must comply with that condition in a timely
> manner.   Absent  a  valid  reason  for  the

_____

[4] All parties are in agreement that Alabama law governs this dispute. In diversity actions, federal courts must apply the substantive law of the state in which they sit.  *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938). Both Allied policies and the Capitol policy were delivered to S. Sharp or his agents in Alabama.  Under Alabama law, to what state an insurance policy was "delivered or issued for delivery" determines the applicable law governing a claim for breach of that policy. *Smith v. State Farm Mut. Auto. Ins. Co.*, 952 So. 2d 342, 347 (Ala. 2006).

> untimely delay, the notice is deemed
> unreasonable, and the determination may be
> rendered by the court as a matter of law where
> the facts surrounding the delay are
> undisputed.

When a primary insurance policy requires notice "as soon as practicable", "promptly", or "immediately", the insured is obligated to give notice within a reasonable time considering all relevant facts and circumstances of case, **and an insured's failure to do so releases the insurer from coverage**. *Id.* at 1050 (citing *Southern Guar. Ins. Co. v. Thomas*, 334 So. 2d 879, 882-83 (Ala. 1976)). The same "reasonableness" doctrine that governs negligence governs "notice." Would Allied have reacted sooner to the Shades Parkway suit if it had been called upon sooner? In all likelihood it would have at least engaged a lawyer.

When determining whether an insured has satisfied the reasonable notice requirement, the Alabama Supreme Court has directed Alabama courts to consider **only** (1) the length of the delay; and (2) the existence or non-existence of an objectively reasonable excuse for the delay. *Fire Ins. Exchange v. McCoy*, 637 F. Supp. 2d 991, 993-4 (M.D. Ala. 2009) (quoting *Thomas*, 334 So. 2d at 883). Absence of actual prejudice to the insurer, even if true, is not a factor to be considered. *Thomas*, 334 So. 2d at 883.

Alabama courts have consistently found that delays similar to SRM's eight-month delay are unreasonable as a matter of law. If

33

the insured cannot present a reasonable excuse for the delay, his insurance disappears. *See Nationwide Mut. Fire Ins. Co. v. Estate of Files*, 10 So. 3d 533, 536 (Ala. 2008) ("A five-month delay in giving notice is sufficiently protracted as to require the insured to offer evidence of a reasonable excuse for the delay."), citing *Phoenix Assurance Co. of New York v. Harry Harless Co.*, 303 F. Supp. 867, 869 (N.D. Ala. 1969) (four-month delay meant coverage was void), *aff'd*, 414 F. 2d 794 (5th Cir. 1969); *Pharr v. Continental Cas. Co.*, 429 So. 2d 1018, 1019-20 (Ala. 1983) (eight-month delay unreasonable as matter of law); *Thomas*, 334 So. 2d at 884 (six-month delay without reasonable excuse was unreasonable as a matter of law); *Correll v. Fireman's Fund Ins. Cos.*, 529 So. 2d 1006, 1009 (Ala. 1988) (one-year delay is unreasonable without sufficient "reasons for that delay"); *B&M Homes, Inc. v. Am. Liberty Ins. Co.*, 356 So. 2d 1195, 1195-96 (Ala. 1978) (insured's failure to notify insurer of suit for seven months after insured was served with the complaint was unreasonable as a matter of law); *Arrowood Indem. Co. v. Macon County Greyhound Park, Inc.*, 757 F. Supp. 2d 1219, 1226 (M.D. Ala. 2010) (a delay of notice that was, at a minimum, five months in length, coupled with a lack of any reasonable excuse, was unreasonable as a matter of law).

Because the eight-month delay in this case **prima facie** voids coverage, the court must decide whether SRM has offered an objectively reasonable excuse.  SRM merely asserts that S. Sharp

34

did not realize until March 2010 that Allied had not been notified of the existence of the Shades Parkway lawsuit.  S. Sharp testified that he did not read the complaints and summonses in July 2009. *See* Sharp depo. at 324-25, 340-41.   He emphasizes that the discovery papers were not designed to alert, and did not alert, him to the full import of the claims made by Shades Parkway. *See id.* S. Sharp necessarily had to **read** Shades Parkway's discovery requests in order intelligently and truthfully to respond to them. SRM complains that the Shades Parkway complaint and discovery documents were confusing.  He had a lawyer at the time.  S. Sharp may not have been as good as he could have been at understanding an important document (reading it might have helped), but a non-lawyer cannot simply fail to read a court complaint against him and expect his lawyer to handle it.   S. Sharp admitted that if he had carefully read the papers, he would have comprehended that a lawsuit had been filed against him, and that it alleged malfeasance or misfeasance of a kind usually covered by E&O insurance.  Sharp depo. at 340-341.  SRM quotes the report of Small wherein Small states that S. Sharp "had previously provided the suit papers to its legal counsel and assumed that he would fully protect the company's interest."  S. Sharp did, in fact, send the papers to Harris, but S. Sharp testified that he had no conversation with, and gave no instructions to, Harris concerning whether to investigate possible coverage or to provide notice to any insurers.

35

Sharp depo. at 338-339.[5]  When Harris was provided copies of the Allied and/or Capitol policies does not appear.  Any failure by Harris to notify the insurer is attributable to the insured. Harris's side of the story is conspicuously absent because the attorney-client privilege was claimed.  Despite the fact that the Shades Parkway lawsuit was litigated for the remainder of 2009 and into 2010, and the fact that S. Sharp has also testified that someone (who?) explained to him "days, weeks, maybe – maybe – maybe weeks later or something" that a lawsuit, separate from the earlier counterclaim and third-party complaint, had been filed against him by his business partners, *see* Sharp depo. at 325, it was not until March 2010, that S. Sharp asked for his insurance policies to be examined and for notice to be sent to his insurer.

---

[5] Although S. Sharp denies having any communication with Harris about whether his insurers should have been put on notice, S. Sharp, through his current attorney C. Sharp, has asserted the attorney-client privilege to prevent Harris from answering any questions about this same issue.  *See* Doc. 75, Joint Stipulation.  S. Sharp has also asserted the attorney-client privilege in regard to communications between and among himself, Harris, and C. Sharp.  Under Alabama law, when a civil party asserts a privilege, the opponent may comment upon it and the trier of fact may consider the assertion of the privilege and draw from it inferences against the party asserting it. *See* Ala. R. Evid. 512A(a); *Trahan v. Cook*, 265 So. 2d 125, 129 (Ala. 1972) ("the general rule established by our decisions is that in civil actions, the failure of a party to a suit, when present at the trial, to testify as to a fact in issue, furnishes a legitimate ground for comment in argument by the opposing party").  *See also* Fed. R. Evid. 501 (privileges in diversity actions will derive from state law).  As such, Allied suggests that S. Sharp's act of preventing Harris from answering any questions pertaining to what, if anything, he discussed with S. Sharp regarding notifying Allied of the Shades Parkway lawsuit indicates one of three possibilities: 1) that there was never any discussion of whether to notify Allied until March 2010, 2) that S. Sharp and Harris discussed the situation and for some unknown reason decided not to give notice to Allied, or 3) that they discussed the situation and agreed that someone should provide notice to Allied but that person ultimately failed to provide notice.  Allied correctly argues that none of these situations presents an objectively reasonable excuse for the delay.

SRM contends that whether an excuse for late notice is "reasonable" is **always** a question for the jury. This does not comport with Alabama law. For instance, would a two year delay, instead of this eight month delay, be excusable? Would the reasonableness of a two-year delay be a jury issue? The question of whether a delay in giving notice is reasonable may be a question for the jury in some cases. But, if "no reasonable excuse [is] offered for a delay in giving notice, the issue may be decided as a matter of law." *Haston v. Transamerica Ins. Servs.,* 662 So. 2d 1138, 1141 (Ala. 1995). Whether an excuse is reasonable is a question for the fact-finder only when there are truly conflicting possible inferences to be drawn from the totality of the relevant evidence. *See U.S. Fid. & Guar. Co. v. Bonitz Insulation Co. of Ala.,* 424 So. 2d 569, 572-73 (Ala. 1982) ("If the insured offers evidence of mitigating circumstances, then conflicting inferences may be drawn as to the reasonableness of the delay, and the question becomes one for the trier of fact."); *U.S. Fid. & Guar. Co. v. Baldwin County Home Builders Ass'n*, 770 So. 2d 72, 75 (Ala. 2000) ("[The insureds] offered an excuse for their delay in giving notice to [the insurer]; therefore, the question is whether the excuse they offered was reasonable. . . . **If the facts are undisputed, however, and the insured does not show justification for the protracted delay, the court may find the delay unreasonable as a matter of law.**") (emphasis added); *Thomas*, 334 So. 2d at

37

882-83 ("[W]here the facts are undisputed and only one conclusion is reasonably possible, the question whether or not the insured under a liability policy complied with the requirements of notice is a question of law for the court.").

The only justification SRM offers for its eight-month delay is that S. Sharp did not read the complaints, and instead gave them to his attorney, while assuming that his attorney would look out for his interests.  He assumed too much.  S. Sharp's failure to read the complaints was not objectively reasonable.  The red flag was waving, particularly when another possible insurer was lurking in the wings.

When an insured reports a claim to his own insurance agent, but the agent fails to report it promptly to the insurer, the insured is not relieved of his notice obligation, and the agent's undue delay vitiates coverage.  *See, e.g., Hawkeye-Sec. Ins. Co. v. Davis*, 277 F. 2d 765, 768 (8th Cir. 1960); *KHD Deutz of Am. Corp. v. Utica Mut. Ins. Co., Inc.*, 469 S.E. 2d 336, 338 (Ga. Ct. App. 1996) (insured telling his agent of claim did not constitute adequate notice).[6]  SRM's eight-month delay, and its failure to

---

[6] SRM's statement that S. Sharp relied on Harris to protect him is quoted from Small's expert report, which this court has already trimmed.  Even if it were admissible evidence, this excuse is not objectively reasonable for the reasons just stated.  Indeed, when Small was deposed, he acknowledged that **if** the failure of the attorney to act, with regard to the notification of the insured, is imputed to his client, then there would "probably" be a failure to give prompt notice.  Small depo. at 49.

provide an objective reasonable excuse, is unreasonable as a matter of law.[7]  When the delay renders the policy unenforceable, as the court finds that it does, *a fortiori*, SRM's claims for breach of contract, specific performance, and bad faith, all of which are connected to the unenforceable insurance contract, evaporate, and Allied's request for declaratory relief becomes surplusage.

SRM devotes much time discussing an issue not raised in Allied's summary judgment motion, and now moot.  SRM contends that to the extent Allied's denial of coverage is based on its interpretation of Exclusion II B of the policy, Allied committed fraud and bad faith.  Exclusion II B provides that the insurer is not obligated to defend or indemnify the insured against claims made by any entity over which **"an Insured by reason of ownership interests or otherwise asserts influence or control."** (emphasis added).  SRM argues that Exclusion II B was superseded by Endorsement 3 to the Allied policy, which specifically provides

_____

[7] SRM also argues, again by way of quoting Small's expert report, that Allied may be an excess insurance carrier, and as an excess carrier, Allied must demonstrate prejudice from untimely notice in order to void coverage.  It is true that "[e]ven if the delay is found to be unreasonable, an excess insurer cannot disclaim liability for an insured's violation of the notice provisions unless the excess insurer can show that the delay caused prejudice." *Arrowood*, 757 F. Supp. 2d at 1224 (citing *Midwest Employers Cas. Co. v. E. Ala. Health Care*, 695 So. 2d 1169, 1173 (Ala. 1997)).  However, and even if Small's expert report had been accepted by this court, Allied need not show prejudice from untimely notice because the Allied policy is primary insurance, not excess insurance.  A true excess insurance carrier has no obligation to do anything for the insured until such time as the primary policy is exhausted.  SRM offers no fact to indicate that the Allied policy is an excess insurance policy, and when Small was questioned about this in his deposition, he admitted that the Allied policy here is not a true excess insurance policy as in the cases he cited in his expert report. *See* Small depo. at 74-77.

coverage for activities involving the management of property in which an insured holds an equity interest of 49% or less. Allied disagrees and argues that if the case survives the motion for summary judgment, it will prove to a jury's satisfaction that Endorsement 3 did not, in fact, modify or delete Exclusion II B. In other words, Allied concedes that the language is ambiguous enough to present a jury question.

### Allied's Providing of a Defense

Assuming *arguendo* that Allied's other defenses fail, it argues that it nevertheless is entitled to summary judgment because it has, in fact, defended its insureds, that it continues to defend them under its reservation of rights, and that it has paid, and is paying, its agreed-upon portion of the cost of the said defense, and has not refused to pay any judgment against them. There is, of course, no judgment. It will be remembered that SRM accepted Allied's tender of a defense. On February 22, 2011, SRM accepted a check for approximately $26,000.00 from Allied to be applied to SRM's defense costs. This paid for Harris's charges from July through December 2010. After Harris departed, Allied continued to pay SRM's defense costs, entering into an agreement with GC, SRM's CGL carrier, which had previously selected attorney Fraley, and thereafter shared the costs of Fraley's representation of SRM. GC hired Fraley on or about October 29, 2011. Fraley's fees have been paid by GC and/or Allied, and neither S. Sharp nor SRM has been

called on to pay any of Fraley's fees.  Allied cannot have
breached its insurance contract because it has performed its
obligations, albeit under a reservation of rights.[8]  Fraley is
still, in theory, defending SRM and S. Sharp in the underlying
lawsuit, even after SRM and S. Sharp have "settled," as will
hereinafter be discussed.  Whether Allied will pay one-half of
Fraley's future fees is for another lawsuit.  Allied has not filed
a compulsory counterclaim against SRM on the subject of
reimbursement of defense costs, and would have forfeited any claim
for reimbursement of its cost of the defense, even if Alabama law
would allow it.

### SRM's Recent Settlement of the Shades Parkway Lawsuit

Allied argues, as a separate defense, not available at the
time of the denial of coverage, that on September 30, 2011, the
parties to the Shades Parkway lawsuit entered into a settlement
agreement that operates to set aside any coverage that might
otherwise have existed.  An insurer is not bound by a settlement
agreement entered into by its insured, unless it agrees to it in
advance.  Allied has not agreed to this settlement agreement.  An
executed copy of the agreement has been provided to the court under

---

[8] To the extent the brief period of time during which Allied denied
coverage could constitute a breach of contract, SRM has waived any claim for
breach or bad faith by accepting and spending funds provided by Allied for
SRM's defense costs, subsequent to the alleged breach.  Further, SRM has
claimed no damages as a result of that brief period of time before Allied
agreed to provide a defense.

seal.  Doc. 66.  The agreement disposes of all pending claims between and among all parties to the underlying lawsuit, **except the claims by Shades Parkway against SRM to the extent said claims are covered by insurance**.  It is betting on Allied's and/or Capitol's liability.  The agreement specifically provides that if this court finds that **no** insurance coverage is ultimately available to SRM, Shades Parkway nevertheless dismisses its action against SRM, bringing the underlying lawsuit to a conclusion.  The agreement further provides that if this court should find that there **is** insurance coverage, whether under the Allied or the Capitol policy, S. Sharp, the owner of both SRM and SR-SC, will be entitled to receive – through SR-SC – 25% of any amount Shades Parkway recovers from SRM.  Allied contends that the settlement eliminated all remaining claims by Shades Parkway against SRM and thus all remaining claims by SRM against Allied.

Part I of the Allied policy only insures SRM against claims for amounts that "the Insured becomes legally obligated to pay as Damages."  The practical effect of the settlement is that SRM will **never** be called upon to satisfy a judgment against it in the Shades Parkway lawsuit, because the plaintiff there, Shades Parkway, cannot recover from SRM unless SRM is backed up by Allied or Capitol.  This creates a conundrum.  Because there is no possibility that SRM itself will become "legally obligated to pay" damages **out of its own pocket**, Allied has no obligation to provide

42

a defense for, or to indemnify, SRM.  As it has turned out, Allied's provision of a defense to SRM was gratuitous, even if it was an exercise of good business judgment by Allied at the time.

In *Bendall v. White*, 511 F. Supp. 793 (N.D. Ala. 1981), Judge Guin of this court applied the same "legally obligated to pay" language, and held that when an insured reaches a settlement that results in an impossibility that the insured will ever pay anything **from its own pocket**, the insurer is simultaneously relieved.  When an insured effectively insulates itself from liability, it insulates its insurer from liability.  The court reasoned:

> [T]he policies issued by both State Farm and Liberty Mutual Insurance Company provide that the companies will only pay on behalf of the insured "all sums which the insured shall become legally obligated to pay as damages." A non-execution agreement was signed between the plaintiff and defendant-driver Christopher Eugene White on March 31, 1980, entering judgment against the defendant Christopher Eugene White in the amount of $900,000.00, with a covenant not to execute against the personal assets of the defendant other than his contractual rights under a policy of insurance.
>
> There appear to be no cases on the applicability of a "covenant not to execute" in this jurisdiction.  However, the Oregon Supreme Court in a well-reasoned "in banc" decision held that a "covenant not to execute" made the insured not legally obligated to pay the amounts in question.  *Stubblefield v. St. Paul Fire and Marine Insurance Company*, 267 Or. 397, 517 P. 2d 262 (1973).  Following the reasoning of the Oregon case, this court holds that due to the covenant not to execute,

> Christopher Eugene White, if he is an
> "insured," is not legally obligated to pay the
> judgment and, therefore, the judgment amount
> is not covered by either insurance policy.

*Id.* at 794-95.  As in *Bendall*, this insured has made a deal with Shades Parkway whereby Shades Parkway releases all claims, **except to the extent the insured has liability insurance to cover them**.

S. Sharp also wants to **share** any recovery against SRM that is covered by insurance.  The settlement agreement contains a provision that is highly pertinent to Allied.  Allied's rights clearly are affected by language that provides: S. Sharp, as the 100% owner of the insured defendant SRM, is entitled to receive, through another 100% owned entity of his, SR-SC, 25% of any insurance proceeds collected by the plaintiff in the underlying lawsuit, Shades Parkway, from an insured SRM.  There is a shared interest between Shades Parkway and S. Sharp in the underlying lawsuit to make as large a recovery as possible, so that S. Sharp's 25% interest would yield the largest amount to him.  There is something incongruous and strange about an insured's owning an interest in a potential recovery against him.  Under said circumstances, the court finds the reasoning in *Bendall* persuasive. *Bendall* has never been overturned or distinguished by any court applying Alabama law.

Allied alternatively argues that the settlement agreement voids coverage because SRM violated the policy's cooperation

44

clause.   Part VII of the Allied policy requires the insured to "cooperate with and assist" the insurer in defense of a covered claim.   The 100% owner of SRM  - S. Sharp – is now at no risk of having to pay any amount to Shades Parkway.   The bigger a judgment against SRM, the more S. Sharp recovers.   If the settlement agreement is enforced by its terms, SR-SC [really, S. Sharp] is entitled to 25% of whatever Shades Parkway recovers.   Given the limitations imposed by human nature, SRM cannot be expected to "cooperate" with and to "assist" Allied in its defense of the Shades Parkway suit when S. Sharp stands to benefit from a judgment against SRM.

Part IV(B) of the Allied policy provides:   "An Insured may not, except at its own non-reimbursable cost, settle any Claim, admit any liability or incur any expense without the Company's prior written consent."   This is consistent with the general law of Alabama on coverage issues.   The Eleventh Circuit, interpreting Florida law, has held that while an insured is free to enter into a settlement agreement **when its insurer has wrongfully refused to provide it with a defense, the insured is not similarly free to engage in settlement where, as here, the insurer has not declined to defend.**   *Continental Cas. Co. v. City of Jacksonville*, 283 F. App'x 686, 692 (11th Cir. 2008).   SRM does not even respond to Allied's argument that its entering into the settlement agreement violated the cooperation clause, or is contrary to public policy.

45

Instead, SRM says that the settlement agreement nowhere **expressly** provides that Shades Parkway's recovery in the underlying litigation will be **limited** to insurance proceeds.  This is a misreading of the undisputed summary facts and of the agreement. SRM argues that "if the case is tried to verdict in excess of $1,000,000.00 coverage, there is no statement [in the settlement agreement] that would release [SRM]."  Doc. 85, Response Brief at 38.  SRM's suggestion that Shades Parkway could possibly recover in excess of policy limits is belied by the record.  S. Sharp testified, without contradiction, that the only way Shades Parkway can recover in the underlying lawsuit is if it proves a liability on the part of SRM **that is covered by insurance.**  He also admitted his financial interest in the outcome of the Shades Parkway lawsuit, and that the bigger the recovery Shades Parkway gets, the more money he may get.  Sharp depo. at 306-08.  Pearce, Shades Parkway's accountant, testified during his deposition that the total amount actually lost by Shades Parkway and being sought by Shades Parkway against SRM in the underlying lawsuit is considerably less than $1,000,000.00.  Pearce depo. at 144-50 and Ex. 11.  Shades Parkway makes no claim for punitive damages. **Unless SRM wins its present action against Allied, it will never, under any circumstances, have to pay any money out of its own pocket to Shades Parkway.**

**Why Allied's Motion for Summary Judgment Must be Granted**

46

Allied is entitled to summary judgment.  This has the indirect effect of agreeing with Allied's counterclaim that it owes no defense or indemnity to SRM.

To the extent Allied may be seriously claiming reimbursement for its expenses in defending SRM, Alabama law does not recognize such a claim, unless in accordance with a writing signed by the insured.  A mere "reservation of rights" does not create the possibility of such a claim.  The court finds no written agreement signed by SRM to this effect.  The nightmare that would be presented if the "reasonableness" of Harris's charges to SRM should become an issue are unimaginable.  Whether Harris's bills were to cover his representations of SRM and/or S. Sharp in both cases in which he appeared would be a further complication.  These problems need not be dealt with here.  Another moot question arises from the theoretical possibility that the state court, which is presiding over two somewhat related cases, might not allow damages *ex delicto* against SRM.  Instead, that court could order an accounting and prolong the agony.  Who would distinguish between damages covered by E&O insurance and tort damages not covered?

## IV.  Capitol's Motion for Summary Judgment

Capitol also seeks summary judgment.  It denies that it breached its contract in any respect.  It denies that it committed any act of bad faith or fraud.  It then relies on the following affirmative defenses: 1) coverage is not available because the

47

claims asserted against SRM in the Shades Parkway lawsuit - in both the original complaint and in all discovery responses - constitute "multiple claims" and "related erroneous acts" that are deemed under the terms of the policy to comprise a **single** allegedly wrongful act committed before the inception date of the policy; 2) S. Sharp concealed material facts when he applied for the Capitol policy; 3) Exclusion II B excludes coverage for claims made by entities over which an insured asserts ownership or control; and 4) coverage is voided due to SRM's and S. Sharp's entering into the settlement agreement discussed in the Allied case.

### SRM's Recent Settlement of the Shades Parkway Lawsuit

The court understands why S. Sharp and SRM, after their removal of this case to this court, amended their complaint to add Allied.  Plaintiffs undoubtedly realized that they could not be covered both by Capitol and by Allied for the same alleged misconduct.  They probably decided on a dual strategy, which made some sort of sense, but the court should not have allowed it.  If SRM did not know which company insured it, it should have read its policies.

Like Allied, Capitol argues that SRM's and S. Sharp's entering into the settlement agreement violates public policy and that, under Alabama law, as set forth in *Bendall*, *supra*, Capitol need not indemnify SRM in the Shades Parkway lawsuit because the settlement was made without its consent and guarantees that the insureds - S.

48

Sharp and SRM - will never be responsible to Shades Parkway unless out of it insurance company's pocket. SRM offers the same response it made to Allied's said contention, namely, that the agreement does not **specifically** say that Shades Parkway's recovery is limited to insurance proceeds. SRM makes no attempt to justify the aspect of the settlement agreement that would award S. Sharp, through SR-SC, 25% of the recovery of any monies that might result from the entry of a monetary judgment against SRM in the Shades Parkway suit. For the same reasons the settlement agreement precludes a recovery by SRM against Allied, it releases Capitol.

### SRM's Claim was Not "First Made" Within the Coverage Period

An insured has the burden of proving that one or more of the claims against it come within the terms of the coverage. *Jordan v. Nat'l Accident Ins. Underwriters, Inc.*, 922 F.2d 732, 735 (11th Cir. 1991) (citing *Colonial Life & Accident Ins. Co. v. Collins*, 194 So. 2d 532, 535 (Ala. 1967)). SRM contends, with regard to the Capitol policy, which was effective from November 2009 to November 2010, that the supplemental interrogatory answers produced to SRM by Shades Parkway on June 3, 2010, during the course of the Shades Parkway lawsuit, expanded the scope of the Shades Parkway claim, and constituted a new claim that was **first made** during the coverage period. Capitol responds that the supplemental interrogatory answers that Shades Parkway served on SRM in June 2010 arose out of

49

the same facts and circumstances as did those in the original Shades Parkway lawsuit that initially commenced in July 2009, and that the discovery responses only increased the **damages** in that lawsuit, and did not constitute a separate or new claim.  In the alternative, Capitol argues that even if the June 3, 2010 filing of the supplemental interrogatory answers did, as a matter of common understanding, constitute a new and separate claim first made during Capitol's policy period, the complete policy language as **fully and properly read and construed**, deems the claim to have been **first made before the inception of the policy**, because the supplemental interrogatory answers are "logically or causally connected by common facts, circumstances, transactions, events and/or decisions" to the claim originally set forth in the complaint in the Shades Parkway lawsuit served on the insured, four months before the inception of the Capitol policy.

The portions of the Capitol policy upon which Capitol relies for this defense are these:

**PART V WHERE AND WHEN COVERAGE APPLIES**

\* \* \*

B.   WHEN

1.   **Claims** first Made

This Policy applies to **Claims** first made against an **Insured** during the **Policy Period**. The **Company** will consider a **Claim** to be first made against an **Insured** when a written **Claim** is first received by an **Insured** during the

> **Policy Period** or any Extended Reporting Period.  All terms and conditions of this Policy in effect on the date the **Claim** is first made will apply to the **Claim**.

Part V B of the policy specifically deals with and defines "multiple claims":

> 5. **Multiple Claims**
>
> All **Claims** arising from the same **Erroneous Act** will be considered to have been made on the earlier of the following times:
>
> a. The date the first of those **Claims** is made against an **Insured**; or
>
> b. The date the **Company** first receives an **Insured's** written notice of the **Erroneous Act**
>
> . . .
>
> 6. **Related Erroneous Acts**
>
> All **Erroneous Acts** that:
>
> a. are committed after the Retroactive Date and before the Expiration Date of the last Miscellaneous E&O policy issued to an **Insured** by the **Company** or any affiliate thereof; and
>
> b. are logically or causally connected by common facts, circumstances, transactions, events and/or decisions; will be:
>
> a. treated under this **Policy** as one **Erroneous Act**; and
>
> b. deemed to have occurred on the date of the first of the **Erroneous Acts**.

(emphasis in original).  "Multiple claims," if they arise from the same "erroneous act," are treated as if they occurred on the **earlier**

of the date when those claims are first made against the insured or
the date upon which Capitol receives notice of the claims from the
insured.  "Erroneous acts" that are logically or causally connected
are treated as if as one erroneous act.  Capitol has convinced the
court that the Shades Parkway lawsuit, served in July 2009, and the
subsequently-served supplemental interrogatory answers, based on a
second audit, which included time during which SRM was insured by
Tudor, only expanded the damages claimed and did not create a new,
or separate, claim.  It arose from the same erroneous conduct,
namely, SRM's alleged mismanagement of the Shades Creek Plaza
property.  Under Capitol's policy, "multiple claims" are defined to
"date back" to the date upon which the first claim was made against
the insured, here, July 2009, four months before the Capitol policy
even became effective.  The words "multiple claims" lose their
common meaning or possible ambiguity when they are carefully defined
in the contract.[9]

Capitol's interpretation is correct because Pearce's first
audit, memorialized in a letter dated June 4, 2009, examined only
SRM's management of the Shades Creek Plaza Property from 2006 to
2009.  Pearce's audit letter formed the basis for Shades Parkway's
initial action filed in the state court in July 2009.  This audit

---

[9] SRM understandably never argues that this language is ambiguous.
Under Alabama law, "if the terms within a contract are plain and unambiguous,
the construction of the contract and its legal effect become questions of law
for the court and, when appropriate, may be decided by a summary judgment."
*McDonald v. U.S. Die Casting & Dev. Co.*, 585 So. 2d 853, 855 (Ala. 1991).

asserted that SRM, during the audit period, failed to collect rent and other fees totaling $218,893.00.  Pearce's second audit, again conducted for Shades Creek and BLH, but this time conducted while the Shades Parkway lawsuit was pending, and memorialized in a letter of May 5, 2010, examined SRM's management **of the very same property**, this time, however, beginning in the year 2000.  The second audit letter expanded the amount Pearce found that SRM owed Shades Parkway, taking a second backward look and arriving at a new total loss of $752,846.53.  As a result of the second audit letter, Shades Parkway amended its complaint to increase the amount of its claim to $752,846.53.  Again, Pearce expressed no judgment on the theory for liability.

The second audit letter discusses SRM's mismanagement of the Shades Creek Plaza property in precisely the same terms as Pearce alleged in the first audit letter.  Pearce examined mostly the same documents during both audits, including the leases executed by the same nine tenants, tenants during both time periods, plus, SRM's tax returns, financial statements, receipts, accounts receivable, accounts payable, and ledgers.[10]  The only real difference between

---

[10]  The first Pearce letter begins:

> I have been engaged by Shades Creek, LLC and BLH Commercial Ventures, LLC, as partners in Shades Parkway, LLC, to review the performance of Sharp Realty as managers of the commercial property owned by Shades Parkway, LLC and to determine the amount of rent income that has not been collected as well as common area maintenance fees.

The first Pearce letter identifies the leases reviewed:

the audits is that in Pearce's second audit he went back to 2000.
The second audit, forming the basis for the increase in Shades

─────────────────────

> . Alabama Self- Insured Worker's Compensation Fund
> Lease
> . Ben G. McDaniel Lease
> . Sterne Agee & Leach Lease
> . Brownell Travel, Inc. Lease
> . Johnston & Conwell L.L.C. Lease
> . The Crittenden Firm P. C. Lease
> . The Children's Hospital of Alabama Lease
> . N-Surance Outlets of Alabama DBA Marine N-Surance
> Brokers Lease
> . Concentra Integrated Services, Inc. Lease

The conclusion of the first Pearce letter reads:

> In my opinion, from the review of the referenced
> documents, Sharp Realty and Management, LLC has not
> collected rent or common area maintenance charges
> appropriately for Shades Parkway, LLC . . .

The second Pearce letter begins:

> We have been engaged by Shades Creek, LLC and BLH
> Commercial Ventures, LLC, as partners in Shades
> Parkway, LLC, to review the performance of Sharp
> Realty as managers of the commercial property owned by
> Shades Parkway, LLC.  We have reviewed the following:
>
> 1. Compared rental income to leases.
> 2. Looked at common area charges to tenants.

The second Pearce letter identifies the same nine leases reviewed:

> . Alabama Self- Insured Worker's Compensation Fund
> Lease
> . Ben G. McDaniel Lease
> . Sterne Agee & Leach Lease
> . Brownell Travel, Inc. Lease
> . Johnston & Conwell L.L.C. Lease
> . The Crittenden Firm P. C. Lease
> . The Children's Hospital of Alabama Lease
> . N-Surance Outlets of Alabama DBA Marine N-Surance
> Brokers Lease
> . Concentra Integrated Services, Inc. Lease

The conclusion of the second Pearce letter reads:

> In my opinion, from the review of the referenced
> documents, Sharp Realty and Management, LLC has not
> collected rent or common area maintenance charges in
> accordance with the leases . . .

Parkway's damages, was first in Shades Parkway's June 3, 2010 supplemental interrogatory answers.  But did it constitute a new and different claim **first made** during the Capitol policy period?  The second audit discusses erroneous acts that are "logically or causally connected by common facts, circumstances, transactions, events and/or decisions" to the erroneous acts alleged when the Shades Parkway lawsuit was filed.  Under the policy language, as the court reads it, related erroneous acts are deemed to be one erroneous act, and are deemed to have occurred on the date of the first erroneous act.

SRM contends that the statements made in the supplemental interrogatory answers are **not** related to the allegations made in the original Shades Parkway complaint because they do not arise from the same alleged erroneous act.  SRM emphasizes that Pearce's audits cover SRM's mishandling of rent collection from different tenants, that each lease is different, and that the negotiation of each lease was different.  These facts, if undisputed, do not detract from the undisputed, more direct facts that the same claimant, Shades Parkway, asserted the same kind and character of wrongful conduct in its original complaint and its amended damages claim.  Pearce folded his findings between 2006 and 2009 into his findings between 2000 and 2009.  He merged them.  All acts are "related erroneous acts", defined in the contract to constitute one act, and they give rise to so-called "multiple claims" that are deemed to be

one claim.  *See Continental Cas. Co. v. Wendt*, 205 F.3d 1258, 1262 (11th Cir. 2000) ("The words 'relate' or 'related' are common terms in everyday usage.  They are defined in the dictionary as meaning a 'logical or causal connection between' two events.") (citing Websters Third New International Dictionary (1981)) (applying Florida law).[11]  A respected treatise on insurance law explains:

> Claims-made policies typically provide that related claims will be deemed to be one claim. Accordingly, if two or more claims are related, the later claims will relate back to the date that the first claim was made. As a result, if the first claim was made during a prior policy period, and the policies afford coverage only for claims first made during the policy period, the policies in effect on the date that the later claims were made will not afford coverage

---

[11] Additionally, the four cases SRM cites in support of its position that the two audits are unrelated are have limited persuasiveness because their facts are so different from those here.  In *Eureka Fed. Savings & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*, 873 F.2d 229, 235 (9th Cir. 1989), claims were asserted against the insured by a multitude of claimants, and the court held they were unrelated because it was a diverse series of exercises of independent business judgment in making and approving individual transactions that led to the claims.  In contrast here, there is one claimant, Shades Parkway, and it complains of one exercise of business judgment – SRM's failure to manage the same property with the same tenants.  *See also Koikos v. Travelers Ins. Co.*, 849 So. 2d 263, 267 (Fla. 2003) (two separate shootings resulting in separate injuries to two victims constituted two occurrences under the policy, which defined "occurrence" as "continuous or repeated exposure to substantially the same conditions); *State Nat'l Ins. Co. v. Lamberti*, 362 F. App'x 76, 81 (11th Cir. 2010) (separate lawsuits by many different plaintiffs, all of whom had their own interactions with members of the insured, constituted more than one occurrence).  In *U.S. Fire Ins. Co. v. Safeco Ins. Co.*, 444 So. 2d 844 (Ala. 1983), the Alabama Supreme Court held that initial water leaking through cracks in a roof and the negligent act of a roofing crew in failing to effectively cover a portion of the roof during additional rains were two separate occurrences under a policy, stating: "In the case at hand, the negligent act of the roofing crew was a separate, intervening, cause.  The damage caused by the roofing crew's failure to adequately cover the exposed portion of the roof was not proximate to the cracks and holes in the other areas of the roof; nor did the latter cause the former . . ." *Id*. at 845-46.  *Safeco* is distinguishable because here, there is only one cause of the financial loss allegedly suffered by Shades Parkway, i.e., the failure to SRM to collect proper rent and CAM charges.

> because the "claim" would have been made during
> the prior policy period."

3 Windt Insurance Claims and Disputes (5th ed.) § 11:5 (2011 Supplement, p. 16).

### SRM's Concealment of Material Facts in its Application for Insurance

Capitol argues, only as a fall-back position, that coverage is voidable because SRM misrepresented its claims history in the Existing Account Application when it applied for the E&O policy. After receiving the necessary forms on November 19, 2009, SRM filled out the forms for obtaining E&O insurance from Capitol. Question 6.1 of the application expressly asked the applicant whether it was aware of "any actual or alleged fact, circumstance or situation, error or omission, which can reasonably be expected to result in a Claim, suit or proceeding during the past year." S. Sharp answered "No".[12] During his deposition, S. Sharp explained that he answered

---

[12] S. Sharp did not fill out a Supplemental Claim Form that allegedly accompanied the Existing Account Application. The Supplemental Claim Form contains instructions in bold print at the top of the page, as follows:

Instructions:

**1. This form is to be completed when the Applicant/Insured has been involved in any Claim or is aware of an Incident which may give rise to a claim.**

. . .

**3. Attach copy of any suit papers or demand letter.**

At the bottom of the Supplemental Claim Forms appears the following: NOTE: THE POLICY FOR WHICH APPLICANT IS APPLYING WILL NOT INSURE THE CLAIM DESCRIBED IN THIS FORM OR ANY CLAIM ARISING THEREFROM . . ." (emphasis in original).

S. Sharp denied knowledge of the Supplemental Claim Form, Sharp depo. at 182-84, but Bates, his insurance agent, confirmed delivery of the form to SRM,

"No" to this question because he thought Capitol was asking, not whether there were any pending suits against SRM, but whether SRM had any reason to believe that during the past year, it had done anything, or failed to do anything that might result in a suit against it.

Section 27-14-7(a), Ala. Code 1975, states Alabama's position regarding misrepresentations in insurance applications:

> Misrepresentations, omissions, concealment of facts and incorrect statements [in an application for insurance] shall not prevent a recovery under the policy or contract unless either:
>
> 1) Fraudulent;
>
> 2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
>
> 3) The insurer in good faith would either not have issued the policy or contract, or would not have issued the policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

To establish a defense under this statute, an insurer "need only have presented evidence that the [applicant] made the misrepresentation and that [the insurer] would not have issued the

---

Bates depo. at 61-62, 65-66.  Further, an unexecuted copy was produced from the SRM files at S. Sharp's deposition on November 2, 2011.  Depo. Ex. 53.

. . . policy had it known the actual facts. *Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1543 (11th Cir. 1994). *See also First Fin. Ins. Co. v. Tillery*, 626 So. 2d 1252, 1256 (Ala. 1993) (An insurer has the right to expect applicants for insurance policies to tell the truth. Alabama has written this public policy into law. Section 27-14-7(a)(3) permits insurers to echo and reinforce the usual requirement that applicants for insurance tell the truth upon penalty of a voidance of the contract.). This principle applies **even if the misrepresentation was unintentional**. *Clark v. Ala. Farm Bur. Mut. Cas. Ins. Co.*, 465 So. 2d 1135, 1139 (Ala. Ct. App. 1984).

An insurer interposing § 27-14-7(a)(3) as a defense has the burden of demonstrating that its underwriting guidelines in dealing with similar misrepresentations are equally and evenly applied. It must demonstrate that in good faith it would not have issued the policy had it known the truth about the risk factors it asked about. *Mega Life and Health Ins. Co. v. Pienozek*, 516 F.3d 985, 989 (11th Cir. 2008). To meet this burden, Capitol offers the affidavit of Laura Corogenes, its Director of Underwriting – Professional Lines, in which she states (without contradiction from SRM) that Capitol's underwriting procedures are completely altered when an applicant reports a pending or possible claim, and that the disclosure of the pending Shades Parkway lawsuit would have led it to a decision not

to offer coverage.[13]  It would surely have read the Shades Parkway complaint, something S. Sharp did not do.

SRM argues that because Capitol did not raise misrepresentation as a reason for its denial in its first letter, the said defense has been waived.  However, in its first denial letter, dated June 18, 2010, Capitol stated categorically: "CSIC further reserves **all** rights in connection with . . . **representations**, **statements**, **declarations**, and **omissions** made in applying for the Policy . . ." (emphasis added).  In its very next communication with SRM, a letter dated June 22, 2010, Capitol said to SRM:

> We also note that the Application for Insurance
> which was completed and signed by S. Sharp on

---

[13] More specifically, the affidavit states that Speciality Global evaluated and underwrote E&O insurance risks pursuant to Capitol's underwriting guidelines that were in effect in 2009.  These guidelines for E&O insurance policies provide that if an applicant reports a claim or lawsuit on its application, the underwriters considered the risk differently from an applicant that reports no claims or lawsuits on its application.  Once an application has been completed by the insured and returned to Speciality Global by the broker, the underwriters evaluate the risk to determine whether to issue a "proposal," meaning an offer to issue a new policy for the coming year.  The underwriters rely upon all information and warranties provided by an insured when reviewing an application.  If an insured submits an application for insurance that discloses a claim not previously reported, or a circumstance that the insured has reason to believe will result in a claim being made against it, Speciality Global would send an email to the broker, requesting details about the claim or circumstance disclosed on the application.  The underwriters expect this to happen only in cases where a claim has been made just prior to submission of the application for insurance.  Once a response is received from the broker, all information is forwarded to the Speciality Global Claims Department for review and investigation.  If the Claims Department determines that a claim first reported on the application for insurance is not a new claim, but one the insured has known about for several months, but not reported, the underwriters are unlikely to offer renewal terms, regardless of the details of the claim, because the insured has not met its reporting obligations under the terms of the existing policy.  If an insured answers "No" to the claims questions on the application, when in fact it did have a claim, or knew of a claim, then the underwriters do not have accurate information upon which to make an informed decision regarding whether to renew coverage.  If Speciality Global later learns that this has occurred, it will stop insuring the risk as early as regulations allow.

> November 10, 2009 did not disclose the
> existence of the suit that was filed [four
> months earlier] in July 2009. CSIC reserves
> all rights to the extent failure to disclose
> information about this claim constitutes
> misrepresentation or an omission of material
> information.

In *First Alabama Bank of Montgomery v. First State Insurance Company*, 899 F.2d 1045, 1063 (11th Cir. 1990), the case upon which SRM depends for its contention that Capitol waived the misrepresentation defense, the Eleventh Circuit held:

> Under Alabama law, when an insurer specifically
> denies liability on one ground, it waives other
> grounds or defenses it might later seek to
> assert.

However, *First Alabama* is materially dissimilar from this case. In *First Alabama*, the insurer's initial letter contained a general reservation of rights. A subsequent letter denied coverage based on a single ground (an exclusion in the policy), without mentioning the late notice defense and without reserving the right to assert any other defenses. The insurer next mailed its final letter, again containing only a general reservation of rights. The Eleventh Circuit held that the insurer could not assert a late notice defense because, **although it initially preserved its right to rely on the late notice defense by including general reservation of rights language**, it subsequently waived the late notice defense by **specifically denying liability based on a single, different defense.**

*Id.* at 1064.   Capitol, at its first opportunity, specifically asserted its right to assert other defenses, **including a misrepresentation defense**, and the specific misrepresentation defense again appears in the very next communication. **At no time did Capitol specifically deny liability based on one defense and on no other**.

Pursuant to § 27-14-7(a)(3), and the case law following it, Capitol has met its burden of demonstrating that it in good faith would not have issued the policy at issue if SRM had disclosed the existence of the pending Shades Parkway lawsuit.  SRM has offered no evidence to the effect that if S. Sharp had said "Yes" instead of "No" in the application, it would have made no difference to Capitol.  The risk evaluation would necessarily have been different unless Capitol were as careless as S. Sharp, something that has not been proven.

### SRM's Claim for Specific Performance

SRM seeks specific performance because it "paid premiums (to Capitol) for E&O coverage."  "The equitable remedy of specific performance rests largely in the discretion of the trial judge, and whether relief shall be granted depends upon a consideration of the particular circumstances of each case."  *Saad v. Saad*, 31 So. 3d 706, 713-14 (Ala. Ct. App. 2009).  SRM's claim fails because SRM has no enforceable contract upon which to attach a claim for specific performance.

The Eleventh Circuit has held:

> In opposing a motion for summary judgment, a
> party may not rely on his pleadings to avoid
> judgment against him.  There is no burden upon
> the district court to distill every potential
> argument that could be made based up on the
> materials before it on summary judgment.
> Rather, the onus is upon the parties to
> formulate arguments; grounds alleged in the
> complaint but not relied upon in summary
> judgment are deemed abandoned.

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.
1995).  If SRM ever had a specific performance claim that could
survive the absence of an enforceable contract, it has been
abandoned.

### SRM's Bad Faith Claims

SRM asserts two bad faith claims against Capitol.  It first
alleges that Capitol "intentionally refuses to afford coverage
without any justifiable reason".  Second, it alleges that Capitol
failed properly to investigate the claim.  These claims fail for the
same reason the claim for specific performance fails.  They are
dependent on the contract claim.

In response to Capitol's arguments, SRM merely quotes the
deposition testimony of Bates, SRM's insurance agent, wherein he
"thought it was terrible that the insurance company, I felt, was
acting in bad faith by trying to avoid paying a claim that the
endorsement clearly provides coverage for."  Bates depo. at 215.
Insofar as SRM contends that Capitol acted in bad faith by
"manufacturing a debatable reason to deny a claim" or by "relying on

63

an ambiguous provision of the policy to deny a claim," SRM offers no evidence in support of these contentions other than to quote Bates's opinion. Bates was never identified by SRM as an "expert". At his deposition, Bates denied being able to offer any opinions about coverage "because I'm not a claims expert." Bates depo. at 231. Bates's personal opinion could never constitute admissible evidence to support SRM's bad faith claims.

### SRM's Fraud Claim

SRM alleges that SRM "was being defrauded because he [SRM] was being charged a premium on properties that [Capitol] had no intention of affording coverage [on] [sic]." SRM attaches the affidavit of S. Sharp in which he elaborates SRM's theory of fraud:

> When Bates took the applications, he knew from past experiences, that SRM managed 11 different properties. He also knew that a Sharp entity owned a percentage entity in each property. I was informed that SRM would be fully covered for all properties that a Sharp entity owned 49% or less by an endorsement. . . . Since a Sharp entity, Sharp Realty-Shades Creek, LLC, owned 25% of Shades Parkway, LLC, was less than 49%, obviously it would be an insured and I personally would also be insured. Ms. Sayers said that I have no coverage for any property of which I own an interest. Since an entity of mine owns an interest in every SRM managed, [sic] I was defrauded.

This affidavit is pure conjecture and hearsay, and is due to be stricken. Capitol's motion to strike, doc. 96, argues that the affidavit contradicts S. Sharp's prior sworn testimony. "Under the law of this Circuit, we may disregard an affidavit submitted solely

for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003). When deposed, S. Sharp admitted that when SRM originally alleged that SRM "is a captive real estate management entity because a **S. Sharp entity owns an interest in each real property managed by SRM**," that it was not a true statement. At that time, SRM also managed at least two properties in which S.Sharp had no ownership, Magnolia Financial Center, managed from October 2006 to December 2009, and a Litchfield Heritage, managed from October 2006 to 2011. Sharp depo. at 29. The statement in S. Sharp's subsequent affidavit that "a Sharp entity owned a percentage entity in each property," contradicts his prior testimony. For that reason, it could be stricken, although it may not be material. S. Sharp was also asked at deposition: "Did you have any general understanding of the terms and conditions of this E&O policy, beyond an understanding that it was to provide liability coverage for your property management activities?". He responded: "I mean, my understanding was that it would provide errors and omissions insurance policy for my company." Sharp depo. at 213-14. Thus, the statement in the affidavit that he "was informed [by whom?] that SRM would be fully covered for all properties that a Sharp entity owned 49% or less by an endorsement . . ." contradicts his prior testimony and will likewise be stricken. Neither stricken portion provides

evidence critical to the outcome.

It is the language of the Capitol policy that underlies SRM's fraud claim. When Bates learned in November 2007 that Tudor would no longer provide coverage for claims arising from management or leasing of properties in which the insured has an equity interest, Bates searched for coverage that would meet SRM's needs. Part I of the Allied policies, as well as of the later Capitol policy, provided **generally** that the insurer will pay sums that an insured becomes legally obligated to pay as damages as a result of "erroneous acts," "erroneous acts" being defined as conduct or alleged conduct by an insured which results from the performance of "insured activities." When Allied issued its second E&O policy, effective November 2008 to November 2009, the policy was amended to add Endorsement #3, which amends the definition of "Insured Activities" under the policy, to provide as follows:

> Endorsement.: 3
>
> This endorsement, effective: November 22, 2008
> Forms a part of Policy No.: SG00813/002
> Issued to: Sharp Realty & Management, LLC
> By: Allied World Assurance Company (U.S.) Inc.
>
> **POLICY CHANGE ENDORSEMENT**
>
> The **Company** agrees with the **Insured** that Item 8 of the Declarations is deleted in its entirety and replaced by:
>
> Item 8: **Insured Activities:**
>
> 1. Property management and Real Estate Sales/Brokerage of non-owned properties for others;

2.      Property management of owned properties in
        which   the   **Insured**   holds   an   **Equity
        Interest**; and

3.      Property management of Majority owned or
        wholly owned properties.

* * *

As respects Schedule #2 above, **Equity Interest**
is defined as ownership of 49% or less of a
covered property;

Based on this express definition of "Insured Activities", the second

Allied policy provided coverage for any erroneous committed acts by

SRM while managing properties owned in whole or in part by the

insured.  The subsequent Capitol policy, effective November 2009 to

November 2010, contains precisely the same endorsement.

However, both the Allied and Capitol polices provide the

coverage is **subject to the other terms, conditions, and exclusions

in the policies.**  Both the Allied policies and the Capitol policy

contain the following plain exclusion:

**Part II.  Exclusions:**
* * *
B.      The **Company** is not liable for **damages** or
        **Claim Expenses** or obligated to defend
        **Claims** made by or on behalf of:
 * * *
1.      Any entity which is a parent, affiliate,
        subsidiary, or co-venturer of an **Insured**
        or any other entity over which an **Insured**,
        by   reason   of   ownership   interest   or
        otherwise, asserts influence or control;

SRM argues that Endorsement 3 "supersedes" Exclusion II B.

Capitol points out that simply because the insuring agreement grants

coverage generally, exclusions legally operate to subtract from coverage. While endorsements and exclusions are part of a policy when attached to the policy, and take precedence over printed portions of the policy, any conflicts are to be resolved in favor of exclusions. *See* Allen, ALABAMA LIABILITY INSURANCE HANDBOOK, § 3-7, pp. 80-81 (quoting *Commercial Std. Ins. Co. v. Gen. Trucking Co.*, 423 So. 2d 168, 170 (Ala. 1982)). Capitol argues, of course, that Endorsement 3 does not conflict with Exclusion II B. Capitol, to this court, successfully articulates the relationship between Exclusion II B and Endorsement 3. Notwithstanding the fact that SRM is facing a claim of liability based on an erroneous act committed while engaged in the property management of an "owned property in which the insured holds an equity Interest," **claims by that entity** are **excluded from coverage if the insured "by reason of ownership interest of otherwise**, **asserts influence or control" over that entity**. Capitol concedes that the preceding general language in the endorsement would cover SRM's activities in managing properties in which S. Sharp has an interest, but the subsequent express policy exclusion takes that coverage away. Whether or not this principle is **fair** is not the question before the court. When pressed during her deposition, Sayers denied that Exclusion II B operates to preclude **all** liability coverage to SRM for activities on properties in which it, or S. Sharp, has an ownership interest. For example, she admitted that the policy would provide coverage if the claim is

made by a tenant of a property which the insured manages and in which insured also has an ownership interest.   Such a claim would not be being made by a related entity as defined in the exclusion. Capitol points out that the language of Endorsement 3 does not suggest any intention to delete or modify subsequent Exclusion II B. The final sentence of Endorsement 3 states: **"All other terms and conditions of this policy remain unchanged."**   (emphasis added).

If Endorsement 3 superseded Exclusion II B, it would only form a basis for a fraud claim if SRM could show that it would provide coverage for all of S. Sharp's affiliated entities, and then proves that Capitol never intended to fulfill its promise.   The court need not decide about Endorsement 3's effect on Exclusion II B, because SRM has not established the first element of its purported fraud claim, namely, a false representation **in the first instance by Capitol.**   Promissory fraud depends upon a promise made by **the defendant** to the plaintiff.   Because SRM's main fraud claim hinges on a representation about an alleged future event (Capitol allegedly having no intention to provide coverage), SRM must satisfy the elements of such a claim, including: "proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and proof that the defendant had an intent to deceive." *Ex parte Michelin North America, Inc.*, 795 So. 2d 674, 678-79 (Ala. 2001).  Fraud is never presumed, and the party alleging fraud must prove the intent. *Allen v. Gulf Life Ins. Co.*, 617 So.

69

2d 664, 666 (Ala. 1993).

SRM has failed.  First it has not identified a false promise **made by Capitol.**  It is undisputed that SRM negotiated through Bates, its own independent insurance agent, at all times during SRM's application to Capitol.  Bates ostensibly knew the coverages needed and wanted by SRM.  Bates sought those coverages through its in-between broker, Gresham, which, in turn, oversaw the application process.  Bates delivered the actual policy to SRM.  No one voiced an objection to Capitol, or to Gresham, or to Bates regarding the policy, including the endorsement or the exclusions.  S. Sharp testified that he had no discussions with anyone, including Bates, about any coverage issue with regard to SRM's affiliated entities. Sharp depo. at 133-34.  Bates testified that he never had any direct contact with Allied or with Capitol, and specifically that he had no conversations with any employee of Allied or of Capitol prior to the issuance of any of their policies.  Bates depo. at 22-23.  S. Sharp signed the application for the Capitol policy on November 19, 2009. The policy was issued on November 22, 2009.  S. Sharp had no direct contact with Capitol until after SRM's notice of claim was sent on March 16, 2010, four months after the Capitol policy was issued.

To the extent SRM may be contending that Gresham, the in-between insurance broker, represented to Bates, and indirectly to S. Sharp, that all claims made by affiliated entities would be covered, and that the said representation can be imputed to Capitol, the

evidence refutes such a suggestion.  S. Sharp testified that he has no idea who Gresham was, or what role it played, in providing Capitol's coverage, that his belief was "that he [Gresham] is some kind of middle guy.  I don't know who he is, really."  Sharp depo. at 335-337.  He knew nothing about who Bates had to go through to obtain the policy, *id.*, or about the relationship between Bates and Gresham.  *Id.* at 336-337.  An insurance broker, except under exceptional circumstances, represents only **the insured**.  He is not an agent of the insurer.  *Carolina Cas. Ins. Co. v. Miss Deanna's Child Care-Med Net, LLC*, 869 So. 2d 1169, 1174 (Ala. Ct. App. 2003). SRM has not suggested, much less proven, that the legal relationship between Bates and SRM is any different in this case.

Because SRM has not shown a promise made to it by Capitol, SRM could not have reasonably relied on Capitol's misrepresentation. Even if there had been some reliance on some indirect misrepresentation through intermediaries at the moment, if the insured came into physical possession of the policy, had the opportunity to review its terms, and such a review would have revealed the elements of the promissory fraud complained of, and remains silent, any alleged reliance is unreasonable as a matter of law.  *AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1208 (Ala. 2008) (citing *Foremost Insurance Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997)).  In this case, several red flags were waving.  SRM overlooked them until it was too late.

71

### SRM's estoppel claim

SRM seeks to invoke a separate doctrine of estoppel to obtain coverage, claiming that "the application for insurance fully disclosed that SRM was a captive in that its entire business was managing properties in which S. Sharp owned an 'equity interest.'" The equitable doctrine of estoppel cannot be invoked to **create** coverage. Whether there was a difference between the policy and the application is an academic question. *See Home Indem. Co. v. Reed Equip. Co., Inc.*, 381 So. 2d 45, 51 (Ala. 1980) ("[C]overage under an insurance policy cannot be created or enlarged by waiver or estoppel and, if there is no ambiguity, it is the duty of the court to enforce the policy as written.") (citing *Aetna Ins. Co. v. Pete Wilson Roofing & Heat. Co., Inc.,* 272 So. 2d 232, 235 (Ala. 1972)). SRM has offered no argument or evidence to support its estoppel claim. The estoppel claim, if otherwise viable, has been abandoned. *See Resolution Trust Corp.*, 43 F.3d at 599.

### Summary of Reasons for Granting Capitol's Motion for Summary Judgment

The claims made against SRM in the Shades Parkway lawsuit - both in Shades Parkway's initial complaint and in its subsequent discovery responses - do not fall within Capitol's coverage period. Coverage was void *ab initio*, at Capitol's option, because SRM, perhaps unintentionally, concealed a material fact during its application for the Capitol policy. Capitol would not have issued

72

the policy had it known of the pending suit.  Capitol cannot breach a contract it can avoid.  It follows that the claims for breach of contract, specific performance, and bad faith against Capitol fail. SRM's fraud claim based on estoppel is also due to be dismissed because SRM has not established that Capitol made a false representation to it prior to its issuance of the policy.  Finally, SRM's recent settlement of the Shades Parkway lawsuit created a new escape door by eliminating the possibility that SRM will ever be "legally obligated to pay damages" for which Capitol would owe an indemnity.

If Tudor's E&O policy had the same "first made claim" provision and other provisions upon which Capitol relies, it may explain why there are not three defendants instead of two.

<b>CONCLUSION</b>

For the foregoing reasons, Allied's motion to exclude the testimony of SRM's expert, Small, will be granted in part, and Allied's motion for summary judgment, Capitol's motion for summary judgment, and Capitol's motion to strike the affidavit of S. Sharp, will all be granted.  A separate order will be entered.

DONE this 31st day of May, 2012.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE